Good morning, Your Honors. May it please the Court, my name is John Panzer, P-A-N-Z-E-R. I represent the defendants, appellants, and cross appellees, Nancy Sinatra, Sheffield Enterprises, Inc., and Boots Enterprises, Inc. Your Honors, let me, if I may, address the cross appeal first because I believe that if I'm in trouble on that one, there's no need to address the appeal. It's our position that there are three undisputed facts which really drive the entire legal analysis on both appeals. First, that the photograph at issue was taken in 1954 or 1955. It's an old photograph. Second, that the photograph was Mr. Stern's agent, Globe Photos, his authorized sales agent at the time, for the purpose of sale to all comers. And third, that there's no evidence of any renewal registration. We submit that those three facts, which are undisputed in the record, so all the Court needs to know to determine that the copyright that Mr. Stern claimed at the latest expired in 1985 for want of a timely and proper renewal registration. With respect to the first fact that the photo was taken in 1954 and 1955, Mr. Stern testified to that. There's no dispute about that. The second fact that it was placed with Globe Photos, there's no dispute about that either. And there's no dispute that the photograph was published then? Well, that is our position, our view of the occasion in the law. Well, I didn't use the word authorized. There's no dispute it was published in 1957 as well, correct? That's correct, Judge Graber. With respect to the issue of publication in the legal sense, Mr. Stern testified that the photo was placed with Globe Photos. He testified that he peddled the photographs taken at the session by selling them to Look Life, the New York Times Magazine section through Globe Photos to all comers. He also said that he was, quote, fairly certain, close quote, that the photograph was published at the time in an entertainment industry publication, illustrated. There also is the May 6, 1996 letter to ABC Capital Cities in which Mr. Stern said, quote, the Sinatra photo discussed is fairly well known in the editorial world having been published umpteen times, close quote. And then, of course, there's the Look publication. With respect to the Look publication, we believe that Judge Snyder correctly found that that publication was authorized. Mr. Stern testified to it in his deposition. He then tried to change his testimony and that's discussed thoroughly in, I believe, footnote four of Judge Snyder's carefully considered opinion on summary judgment. It is our position that the fact of delivery of the photograph, apart from the Look publication, apart from the Chauvez Illustrated publication, the fact of delivery of the photograph to Globe for purposes of sale constitutes publication in the legal sense under American Vitagraph fee levy. The district court so found in that finding. Once the court appreciates the facts as developed on summary judgment and the significance... Where did the district court make that determination? Pardon me, Your Honor? Where did the district court make that determination? That the photograph was published under American Vitagraph fee levy? That the limit, that giving the photograph to Globe for the purpose of sale was a publication. I believe that is, at the end of the district court opinion, the alternative holding of the It looks like maybe 261. I believe that's correct, Your Honor. So the district court's... I understood that to be a holding that publication in Look sufficed. Well, the court did say that publication in Look sufficed, and the court did find that the publication in Look was authorized. But the court noted that in oral argument, we made the additional argument that notwithstanding the Look publication, the placing of the photograph with Globe for purposes of sale is a publication under American that determination was made, because I don't read it to make that. I understand you argued it, and the district court recognizes the argument. But my understanding is that she found, or she held, that the publication in Look was authorized and sufficed. That is to me be that I'm reading the district court opinion differently than... I'm asking you if you do read it differently, where I should look to see where that's in there. I just don't see it. I thought it was on page 261. Okay. Thank you. With respect to the appeal, and we're painfully aware of the standard, it's an abusive discretion standard with respect to the issue of attorney's fees. It's our position that the district court's discussion and resolution of that issue is internally inconsistent, because the district court based its denial of fees on Mr. Stern's declaration, and the district court's conclusion that because Mr. Stern did not know of the Look publication, that it came as a surprise to him that he was acting in subjective good faith when he brought the lawsuit. And it's our position that, looking at the undisputed facts, that apart from the Look publication, his own testimony indicates that he placed the photograph with Globe for sale. His own testimony regarding the Showbiz Illustrated publication. His own statements to ABC and Capital Cities that the photograph had been published, quote, umpteen times, that he knew or had to know of the problem with the copyright because of the publication history of the photograph. And having known that, he could not have been in subjective good faith or objective good faith when he brought the lawsuit. We took a lot of time to obtain the documents from the file of what was behind the attempt to obtain the 1996 registration. And that's laid out in briefs. Let me speak a little bit about that registration. As the district court indicated, Mr. Stern attempted to support his claim of copyright with only the 1996 registration, nothing else. And his position was that that 1996 registration was or was intended to be a group registration with photographs that were published, all of his photographs that appeared in the Nancy Sinatra book. District court found that that was not a group registration. It was attempted to be a group registration. But the district court, we believe, correctly found that it was a derivative work, a registration for a derivative work because of the amendment of the registration in October, I believe, of 1996 when, as a result of a conversation with the Copyright Office, Section 6A and 6B were amended. And they were amended by inserting into Section 6A the indication that some of those photographs were published before, and 6B indicated new photographs. And on the basis of the change to the registration, it was clear that the registration only covered the new material, that is, the new photographs, not the old ones. We asked Mr. Stern in interrogatories if the photograph at issue was one of the previously published photographs, and he said yes. So it was clear from the record that the registration did not cover the photograph at issue. The court relied on cooling systems for the principle that in a registration for a derivative work, the underlying or preexisting material, the registration cannot create a presumption of copyright in the underlying material. And that case, which is undisputed in the Ninth Circuit, is not problematic. It's settled law. The only case which goes the other way is a district court case, Perfect Ten, which came two years after Mr. Stern filed his lawsuit. The cross-appellant's response to the cooling systems case was to simply ignore it. We've never heard from cross-appellants why cooling systems doesn't apply. Their argument that they made in the district court, their argument that they made on appeal here, is that the registration, they say, is a group registration, even though it's clear from inspecting the registration that's totally to the contrary. They say that the registration is a mistake, that filling out Section 6A and 6B is a mistake. Well, there's no evidence of that. If anything, it's clear that the registration was attempted as a group registration, and what happened was the Copyright Office rejected that attempt, and we've developed evidence from the file of the Capitol of Images people that would appear to indicate that it was clear to Mr. Stern's representatives they could not get a group registration. They could not register that particular photograph because of the prior publication history. With respect to the issue of the thirdly factors, as I've indicated, we believe that Judge Snyder's analysis was internally inconsistent on the issue of good faith. Certainly, factor one degree of success on the merits, in terms of frivolousness, Mr. Stern knew he had a 1954 photograph. He also said in interrogatories that he didn't recall the date of first publication, but he knew it had been peddled in the 1950s, was fairly certain it had been published in Showbiz Illustrated, he knew he had no registration covering the photograph. In light of the law, in light of the fact of he couldn't say when the first registration was, how could he ever believe he could prove his claim to copyright? In just a word, obviously the district court has got considerable discretion in awarding attorney's fees. And simply because the judge could have gone your way doesn't mean she had to go your way. So why is it that you think that she had to? A, because the finding that her conclusion is based on, that is Mr. Stern's subject of good faith, is not supported by the evidence. That her ruling is internally inconsistent because it discusses, I believe, and relies on American photography leaving for publication over and apart from the Look publication. You don't need to discuss the David Declaration. You don't need to discuss the application of Evidence Code, Section 406. And that's the single most striking response I have to the district court ruling, that it's internally inconsistent in that way. Once one looks at that, then all of the other factors that Fogarty analysis relies on show, we believe, or compel the award of attorney's fees. I'll reserve the remainder of my time, Your Honor. Thank you. Good morning, Your Honors. My name is Serge Soni. I represent Mr. Stern. Addressing first the cross appeal, if I might. What the district court did in this case was invalidate a copyright. And it did so based upon the admission into evidence of what we believe is incompetent evidence of a custom and practice presented through the David Declaration. Well, let's just disregard that for a moment. Mr. Stern himself testified that the Look publication came through Globe and was authorized. What he testified, when we look at the specific deposition testimony, is he said, if Globe authorized it, then it's mine. What he said is, Globe is my agent. Yes. If Globe authorizes, then it's authorized. And we don't receive from that position, Your Honor. Now, so what he said was, in answer to the question, do you have any reason to believe this publication was not authorized by you? Answer, oh, this is authorized by Globe Photos, which is automatically authorized by me, since I made them my agent, and they would sell my, what I would call my file photos, yes. That is exactly what it says. And what he was authorized by him. Let's look at the context of that examination, Your Honor. He was presented with a 1957 issue of Look Magazine. He'd not seen that photo in there, but the image appeared with a reference to his name and to Globe's name. He had no independent, direct knowledge of any authorization by Globe. The best that he could do is reading what was before him. Assume that if Globe authorized it, he agreed it was an authorized use. But in reality, when we recognize the context, he had no direct personal knowledge of an authorization. There's absolutely no evidence in the record that Globe, that Look's publication was not authorized. Agreed. And there's also. His statement that it was authorized is the only statement that stands on the subject. But his statement, Your Honor, is not based on any personal. It's in supposition. All I'm taking is what he said. I understand that. There's nothing even in the record to show that. And if anybody should know, he should. Well, I'm not sure that that's an accurate conclusion. We agree that Globe was his agent. We agree that if it was a volitional, authorized act by Globe, then it's authorized. But that's not what he said. That's what you tried to say he said, but that's not going to fly. What he said was, it's authorized automatically. We often receive in courts testimony of witnesses as to all kinds of matters. As part of the evaluation of whether to accept or believe that testimony or to credit it, we look to see whether that person had a basis for personal knowledge for the statements made and for the facts asserted. In this particular case, it was clear he was in Paris at the time. He had not known about the Look Magazine publication. He had no basis of knowing that it was authorized. He did not recall ever having been paid by Globe on it. He had no documents establishing that it was authorized. Globe authorized this, then it's authorized by me because they're my agent. It is a statement divorced from personal knowledge and therefore can't be credited against him as an admission that he authorized it. If Globe authorized it, he certainly did. But just as there is no evidence that Globe didn't authorize it, there is no evidence that Globe did authorize it. Globe doesn't exist anymore and has no records of any authorization given to Look. Look doesn't exist anymore and has no records. So in the absence of anything other than his statement in his deposition under oath that it was authorized, how could it possibly be a reasonable inference that it was unauthorized? Well, that's where we turn to the burdens. I'm not asking you to turn to any burdens. I'm asking you based on everything that is in the summary judgment record, is there a possible reasonable inference that the publication in Look was unauthorized? I don't want to hear about burdens. I want to know based on the facts in the summary judgment record, why is there a reasonable inference that the publication was unauthorized? The clear and indisputable fact is that the image appeared in the magazine. There is no evidence as to whether it was authorized or not authorized. We have to turn to the burdens at that point. Where Globe appears there and your client testified that it appeared to be authorized to him. Only because Globe's name appears there. And there's nothing more. I could stand here and be presented a document, asked what it says, I could read it. That doesn't give me or my testimony the credibility of personal knowledge such that it is admissible evidence. So you're asking us to presume though then, or allow a reasonable inference, right infringement in 1957 even though there's really nothing other than, there's nothing. Somewhere or the other. And if it was our burden to establish in an action against Look that this was an act of infringement. Isn't there a standard evidentiary principle that it is presumed that the law is followed unless there's some demonstration otherwise? Honestly, I don't know the answer to that. I don't think that we can always assume that the law is abided by. And that all actions are in conformance with the law. Particularly in a case like this. Where there is no evidence that the parties who would have, should have known of that authorization had no knowledge of it. Mr. Stern would likely have been, let's recognize Look in 1957 was a premier publication. If his agent had secured a placement in Look, he would surely have announced that from, heralded it from the mountaintops to Mr. Stern saying look what a great job I did. I've got you placement in Look. Here's your check. He did but that was 50 years ago and most of us don't remember that well that line. Mr. Stern is 83 years old, 84 years old this year I believe. He was in Paris at the time. He was receiving royalty payments with respect to other licenses for other images that Look placed for him in other places. He has no knowledge or recollection of that placement with Look. If we have to recognize the circumstances of the events, then we must also note that his absolute ignorance of that placement, the significance of a placement in Look, the absence of any payment to him, all suggest and draw a, lead to a reasonable inference that the image was published without an authorization. It is not unusual that that cactus was that groups of images, the magazine would then select one or two or none and they were supposed to go back and negotiate and secure licenses. It is not beyond the realm of reasonable belief that there would be instances in which images would publish before licenses were secured or that they were mistakenly published because they thought they had a right to do so but we have no evidence going either way. And that's why, Your Honor, I believe we do go back to what the standards are and what the burdens are on a summary judgment motion. No circumstances Globe, which would have, in your scenario, sent the photos for Look's perusal, would not have screamed bloody murder if they had shown up in the magazine with Phil Stern, with Stern slash Globe in there. Certainly if they knew about it, it is likely that they would have. If they didn't know about it, they couldn't have. Well, you've just said it was the most famous publication in America, so how would Globe, who sent in the photos and whose entire living was made doing this, wouldn't have noticed? It would also have been a very, very large client who purchased lots and lots of different images from them and you tread lightly with big clients. But there was no indication to Mr. Stern that the image had been published in 1957 in Look. He didn't know about it. He wasn't paid for it to his recollection. He has no knowledge of it. He scoured his records. He couldn't find anything evidencing that it had been authorized. He presented the evidence to the court in the following way. I created the image. No question about it. It's copyrightable. No question about it. I gave it to Globe. Certainly, the mere placement with Globe doesn't mean that it's available to the general public or it's a general publication. I don't know anything about, have never heard of, any authorization for Look to use it. I have authorized use. The defendants now, on their motion for summary judgment, seeking to establish that this is an authorized general publication, have the burden. They agree that's their burden, to come forward with actual evidence that it's an authorized general publication. What do they give us? They don't give us anything on the specifics of whether Globe authorized it to Look. They rely entirely on the David Declaration, which is incompetent. Miss David, while she was at Look, was not in a capacity where she would have known of what the custom and practice was, and certainly doesn't testify that the custom and practice was actually performed with respect to this particular transaction. Her declaration is so vague that it is too weak to be admissible. And even if it were allowed, what it does is it creates a genuine issue of a material fact that should have been reserved for the jury to decide and could not be decided by the court on summary judgment. The defendants did not come forward with evidence that Look used it with authority. It was not Mr. Stern's burden to establish that Look used it without authority. Counsel, let me just backtrack for one second and ask you, I want you to assume for a moment that the, and I know there's some question about this, but I'd like you to assume for the moment that the district court alternatively found that the unrestricted placement with Globe constituted a general publication. Is that legally correct or incorrect in your view? It's incorrect. Because? American Vitagraph and the Supreme Court's decision on American Tobacco both established that the mere placement with an agent doesn't constitute making it generally available to the general public for all uses. Now, you've asked me to assume that the placement with Globe was unrestricted in this case. You've asked me to assume that Globe was making it available to all comers. There's no evidence of that. In fact, Mr. Panzer made a repeated reference to that. And that's not what Mr. Stern testified. He didn't say anything about all comers. He talked about specific magazines and particular kinds of uses. He also talked about uses in editorial context in his letter, Mr. Stern did, in his letter regarding the CBS controversy. Now, realize that under the 1909 Act, and even today, the doctrine of limited publication is respected and followed. And there are uses that are permitted for limited purposes, one-time publication, only in print, never to be reused, which is a limited publication. It doesn't extend to the general public the opportunity to secure a copy, to sell it, to dispose of it, to make a derivative from it, or do anything else with it. It still maintains all of the elements of control and intent to maintain copyright ownership. And in order, in this industry, in the photographic industry where professional photographers are looking to license their images, the value is retained by providing them sparingly, limited licenses so they get maximum value. Once the image is generally available, there is no interest in it. It no longer can generate an income stream for the photographer. Do you agree that if the publication and look were authorized, that that ends this case? Well, it raises yet the second component of the analysis, which is was it a general publication or was it a limited publication? A publication to look surely was as bad as general as one could get. A publication by look of a magazine for general distribution to the public is a general publication of the look magazine. However, it is not look magazine's distribution that we're looking at. We're looking at Mr. Stern. All that occurred here was that Mr. Stern, through Globe, made that image available to look for a one-time publication in print, never to be reused. That is a limited publication and only going out to subscribers. You've got to be kidding. No, Your Honor. You mean the distribution of look magazine is limited? I did not say that. I said exactly the opposite of that. I said the distribution of look magazine is a general distribution, but the distribution of the photograph by Globe to look is a limited distribution. It is not made generally available to Time, Newsweek, and every other publication. It is not available to all the television stations. It is only available to look for a single one-time printing period. That is all that was permitted to look. What authority do you have for the proposition that publishing a photograph, an article, whatever it may be, in a general distribution format such as this is not a sufficient publication to start the clock running for the need to renew a copyright? In order for the trigger for a renewal, there has to be an authorized general publication. White v. Kimmel tells us that. Okay, so now we've assumed authorized, and you're saying this doesn't count as a general publication? Because the focus is not on whether look distributed. If you're right, then nothing will ever be generally published, because almost always something is published in one format. It's published as a book by one publisher, or it's a photograph published in the National Geographic, but not also in the L.A. Times. Nothing would ever be generally published if we followed your logic, it seems to me. Well, there are many instances where there is a general publication, where a photograph... We can go out there as photographs. They're made generally available to all comers. You can buy a single print. You can buy it in a poster size. You're free to dispose of it. You're free to do anything that you want with it. It is available to the general public. That is vastly different than when an author, for example, grants first North American serial rights to his particular article to be used in a particular magazine. That's all he gave, is a single printing authorization for use in a single magazine going to its subscribers. Period. No more. Couldn't use it on the web. Can't use it in other magazines. Can't make copies and hand them out on the street corner. The only rights given are to print it in that magazine once. And you think that the clock doesn't begin to run, then? It is a limited publication. It cannot begin the clock to run. That's clear. The issue is, does it amount to a limited publication or a general publication? And with all due respect, Your Honor, the focus is not what Look did. The focus is what Stern did and what Stern did through Globe. What Globe, if it authorized Look, authorized it only to publish. That's the problem. I mean, you have to assume that the publication in Look was authorized because that's what he said it was. I think that assumption, Your Honor, would not stand scrutiny because if I said there will be a blue moon tonight simply because I said it doesn't make it so, if I have no basis for knowledge for that, then why would you credit me with it? Globe authorized, appears to have authorized it. If it did, then I did. They're my agent. I acknowledge that. But he doesn't have a basis for knowing that Globe actually authorized it. There is nothing in the record that shows that he had a basis for that. How can we credit that against him? That would be, I think that would be her. The core of the court's, this is a series of analytical, but the core of the issue is whether or not, because she did not decide that simply placing it with Globe was a publication. In fact, there's nothing, no support for it at all. She simply identified the arguments by the defendants, and then she ultimately reached her own conclusion. Her conclusion was not based on the placement with Globe. It was based only on the Look placement. And in connection with the Look placement, it was the defendants who had to come forward with proof that there was an authorized general publication. If I may reserve my remaining time. Okay, Mr. Panzer. Thank you, Your Honor. Just two points in response to Mr. Soni. First, with respect to his assumption that the defendants had the burden of proof, I respectfully disagree. The plaintiffs have the burden to show that their copyright was valid and subsistent. To do that, they had to show originality, which they did. They had to show proper copyright subject matter, which they did. And they have to show compliance with statutory formalities. That they did not do. One usually does that with a copyright registration. Mr. Soni didn't talk about the registration. If the court accepts that the registration, as a derivative work registration, did not cover the photograph, because of cooling systems, the plaintiffs were unable to come forward with evidence to show that they had a valid copyright for the photograph. Not being able to do that, the burden never shifts to the defendants to come forward with what Mr. Soni, I believe, erroneously terms a quote, close quote. And if one looks at Judge Snyder's decision, that is exactly the analysis Judge Snyder employed. The first part of her opinion says they have to come forward with sufficient proof that they have a valid copyright. They didn't do it because the registration doesn't cover the photograph and cooling systems doesn't let you infer copyright validity to the pre-existing material from the registration for a derivative work in a case. Then she said, by the way, if we assume that they have carried their burden, in any event, the defendants rebutted that presumption with evidence of the look publication. Second point, with respect to American Vitagraph v. Levy, and the placement of the photograph with Globe, I said it was to all comers. This is what Mr. Stern said in his deposition. What did you do with the photographs once you completed the session? Answer, I peddled them. Question, what do you mean you peddled them? Answer, I sold them. Question, who did you sell them to? Answer, Look Magazine, Life Magazine, New York Times Magazine section, and all over Europe. Globe Photos had subsidiary agents in Europe and also they sold in countries that had large interests in Sinatra and obviously that would cover a lot of ground. His own testimony indicates that when the photograph was placed with Globe, it wasn't placed with Globe with restrictions for sale or distribution to limited publications. It was to all comers. Lastly, I understand that if your honors don't believe that the district courts is internally inconsistent that I probably won't succeed in convincing the court to apply all of the Fogarty factors because I recognize that the district court has discretion in the matter and I'm aware of that. But I do believe that if the court looks at the briefs, in all the Fogarty factors, the way this case was litigated, the very many things that the plaintiffs did to make this a very difficult case, all of those factors are amply satisfied. Frivolousness, objective unreasonableness, and there are questions of compensation and deterrence that really cry out here for compensation. Lastly, we don't think this is a happy occasion for anyone. We recognize Mr. Stern's age and his circumstances. We're not happy about this. All we're saying is that the law is the law. Thank you, your honors. And I'm happy to respond to any questions. I don't think we have any. Thank you. The court was wrong when it construed the copyright registration as a derivative work registration. There was nothing derivative about it. It was not a group registration. It was a registration for a collective work, a collection of images that Mr. Stern selected to include in a group. It was not a claim for group registration, which is a registration for a bunch of images all taken within the same time period. These were images taken over different times, some not even taken by him, that he collected in a collective work and sought to register. The difference is that it does not follow that the underlying works included in a derivative work, the original work from which the derivative was made, is covered by the registration. Cooling Systems is correct about that. We don't disagree with Cooling Systems. But in a collective work, the underlying works, original works that are part of the collection if they are by the same author as created the collection, are entitled to the presumption of validity. And even the defendants agreed in their brief. That's true. Because of that error, the court failed to accord the presumption of validity. But even if we set that aside, plaintiffs carried, Mr. Stern carried his burden of coming forward by demonstrating that he had copyrightable subject matter, he had authored it, and that it wasn't authorized, had not been published. He testified to that. That's evidence. The court said incorrectly that there was no evidence sufficient to establish the validity. He testified as to that. That's evidence. The burden then shifts upon the defendants to come forward to show that there was a general publication and it was authorized by Mr. Stern. We've already addressed those issues, and we've indicated what we think is wrong about that. Even if we credited the David Declaration, all that we then have is a head-on contest between the two parties. Was it authorized and was it not? And the evidence that the prior fact should have been allowed to view and decide is whether the David Declaration sufficiently established a custom and practice, whether the David Declaration further showed that that custom and practice was followed in connection with this particular transaction. We think it doesn't. But could all reasonable jurors conclude that it did? We feel the court made an error in finding that the David Declaration was sufficient to show an authorized general publication. It should have been. We believe it was their burden. We believe that they didn't carry it, so we should have prevailed. But if we don't prevail, then it should have been reserved for the jury. If there are other questions, I'd be happy to answer them. No other questions, but I have a comment that I'd like to make to both counsel. And I'm speaking only for myself, but I found the tone of the briefing on both sides by all counsel to be very nasty. And I find that extremely unhelpful. I'm sure that when you write your brief, you're doing it because you believe that you're saying things in a way that will be the most convincing to the court. And so in this briefing, I become distracted and I lose focus on the issues that you're trying to get me to understand on the merits. And I just commend that thought to all of you for your future reference. Your Honor, our apologies. We certainly tried to resist that. But it was difficult when the literary license was taken. I'm not asking for an explanation. It's a cross-the-board comment in this particular case. And in which I join. And I think the words of the wise are very well spoken. Thank you, counsel. The matter just argued will be submitted. And we'll now turn to the Eldridge matter. Thank you.
judges: Browning, Rymer, Graber